UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERESA MULLEN,

          Plaintiff,                           Case No. 04-71897

vs.                                         HONORABLE LAWRENCE P. ZATKOFF
                                             HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

          Defendant.
_____/

REPORT AND RECOMMENDATION

I.     Background

Theresa Mullen brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

     A.     Procedural History

Plaintiff applied for benefits on May 7, 2001, alleging disability since August 28, 2000 (R. 40) because of carpal tunnel syndrome with complications in her elbows, arms, and shoulders (R. 53).

The state agency denied Plaintiff's claim on August 24, 2001 (R. 25-29). On April 4, 2003, Plaintiff, represented by an attorney, had a hearing before Administrative Law Judge

Douglas Jones ("ALJ") (R. 25-77). Mary Williams testified as a Vocational Expert ("VE") (38-41). On May 28, 2003, ALJ Jones issued a decision denying Plaintiff's claim that she was disabled within the meaning of the Social Security Act (R. 7). The ALJ found that the Plaintiff had the severe impairments of bilateral carpal tunnel syndrome, bilateral epicondylitis, asthma, hypertension, exogenous obesity, tendinitis of both shoulders, possible rheumatoid arthritis, and a history of ventral hernia/repair surgery, but that Plaintiff's impairments did not meet or equal one of the listed impairments (R. 18). The ALJ also found Plaintiff not fully credible (R. 18-19). Accordingly, the ALJ found that the Plaintiff retained the Residual Functional Capacity ("RFC") to perform light work that requires no lifting or carrying over 10 pounds, no overhead reaching, occasional forward reaching, frequent (but not constant) fine manipulation, no forceful or sustained gripping or grasping, no constant repetitive wrist movements, and no use of vibrating hand tools (R. 21). The Appeals Council denied review on March 26, 2004 (R.4-5).

    B.    Background Facts

Plaintiff was born on February 11, 1952, and was fifty-one years old at the time of the hearing (R. 159). She completed high school and attended Michigan State University for one year (R. 160). She worked as a production worker, parts packer, machine operator, and inspector for General Motors' AC Spark Plug plant (that later became a Delphi plant) for 28 years, until August 29, 2000, her date of last employment (R. 53).

        1.    Plaintiff's Hearing Testimony

Plaintiff has a driver's license and drives about twice a month because she has problems

holding the steering wheel, getting in and out of the car, and walking (R. 163-164). She has not been on any trips out of Flint in the past few years (R. 164). Her activities have lessened since she filled out her activity sheets for Social Security (R. 175).

Dr. Seit Saeed is Plaintiff's primary care physician, and Dr. Weber was her doctor before him (R. 164). Although her carpal tunnel is severe and she is limited in what she can do, she has not had surgery because some of her co-workers had the surgery and their functionality did not improve or declined (R. 164-165). Plaintiff testified that she is "terrified of losing what little [she has] left, [of her ability] to do [her] personal grooming and things of that nature." (R. 165). At the time of the hearing she was able to hold a cane or drink a cup of coffee, and felt carpal tunnel surgery could jeopardize the minimal use of her hands that she retains (R. 183). She has swelling and pain in both hands and has no tactile sense on her palms (R. 170, 176). She cannot maneuver buttons or zippers on clothing (R. 178). Upon exam, doctors were "amazed" that she had any function in her hands at all (R. 184). She takes Celebrex for her hands and Foradil for asthma. She has not been hospitalized in the year prior to the hearing (R. 166).

Plaintiff is 5'5" and weights an estimated 380 pounds (R. 166). Because her doctor's scale only goes up to 300 pounds, her weight is estimated (R. 166, 179). She has been prescribed several diets but always regains any lost weight (R. 179). She has had asthma since 1984, which flares up unpredictably, sometimes due to stress or cold (R. 170, 174). She has asthma attacks a few times a month and uses a rescue inhaler (R. 175).

Plaintiff reports problems sitting, standing, and walking (R. 171). She testified that she could walk 10 to 20 feet, but not around the block. She cannot bend, squat, or carry things heavier than a cup or dish (R. 171-172). Her sisters and daughter help her around the house and

do her errands outside the house (R. 172-173). On a typical day, she watches TV, listens to the radio, reads, talks on the phone, showers, and rests frequently (R. 173-174). She has to lay flat for periods in order to get relief from the swelling in her legs (R. 174).

She had a work-up for rheumatoid arthritis by Dr. Saeed (R. 177). He performed a bone scan that was "very, very bad". She also has a ventricular hernia. One month prior to the hearing she saw Dr. Manassian for evaluation for bariatric surgery and was awaiting insurance approval for the surgery at the time of the hearing. She felt that she would die without bariatric surgery, but that carpal tunnel surgery was not absolutely necessary (R. 183). She also has sciatica in her legs and high blood pressure.

In the last 15 years, Plaintiff worked as an assembler and packer at Delphi (R. 168). Her job required her to take parts off a conveyor belt or an assembly line and pack them into containers. At times, she was required to assemble components with screws (R. 169). She performed this job seated and standing. She lifted parts weighing 10 to 20 pounds. During the last four years of her employment, she was packing without the assembly portion of the job (R. 170). Plaintiff last worked on August 29, 2000, due to severe pain in her shoulders, arms, and hands (R. 168). She testified that she could not go back and do any of the jobs she held at Delphi, or any job lifting over 10 pounds (R. 176).

Upon questioning by the ALJ, Plaintiff testified that she weighed over 350 pounds in 2000 and was able to work (R. 180). She sat three hours of the eight hour workday, but did not have to stand or walk for five hours straight (R. 180, 181). Her ability to walk and stand lessened gradually and she was able to stand longer in 2000 than at the time of the hearing (R. 181, 182). She began using a cane six months prior to the hearing (R. 182).

        2.     Vocational Evidence

When asked to consider a hypothetical individual of Plaintiff's age, education, and work experience with the limitations of: light work with no overhead reaching; no forceful or sustained gripping or grasping; no constant, repetitive wrist movements; no use of vibrating tools; and occasional fine manipulation, VE Mary Williams testified that such a person would not be able to perform Plaintiff's past work (R. 185). In the regional economy such a person would be able to perform the unskilled, light work of information clerk (1,700 jobs), security guard (10,700 jobs), and hostess (14,600 jobs) (R. 186). When asked to consider the same person with the additional restrictions of no lifting or carrying more than 10 pounds and use of a cane, VE Williams testified that such a person would be able to perform the same jobs (R. 186-187). The VE further clarified that light work requires standing up to six out of eight hours (R. 189). When asked to consider the same person with all the above listed limitations and the additional limitation of sedentary work, the VE testified that such a person would be able to work 1,500 surveillance system monitor jobs, 1,700 referral and information clerk jobs, or 2,700 switchboard operator jobs (R. 187). If the same person were further limited to no work that required a sense of fine touch, the sedentary jobs of switchboard operator and surveillance system monitor would be eliminated, leaving the job of referral and information clerk, and there would be no change in the number of light jobs available (R. 188). If the hypothetical person were confined to their home, due to an inability to ambulate and the need to rest periodically throughout the day, no jobs would be available (R. 189).

Upon questioning by Plaintiff's attorney, the VE clarified that the light jobs she listed would not require manipulation of objects other than occasionally picking up a menu or handing out a pamphlet (R. 190).

    C.    Medical Evidence

At the request of Plaintiff's employer, D.V. Pasupuleti, M.D., performed a neurological consultation and right upper extremity EMG on Plaintiff on May 17, 1999 (R. 89-91). Upon examination, she had negative Atson's maneuver, Lhermitte's sign, and positive Tinel's and Phalen's at the right (R. 89). She had normal ambulation and no sensory loss to pinprick or touch. The EMG was an abnormal study showing evidence of right upper extremity median nerve compromise of the wrist compatible with carpal tunnel syndrome involving sensory and motor fibers, demylinating and axonal, severe in degree (R. 90). Dr. Pasupuleti recommended that she go back to her previous job with restrictions on repetitive work.

At the request of Plaintiff's employer, Plaintiff saw A. George Dass, M.D.,an orthopedic surgeon, on August 23, 1999 (R. 92). On examination, Plaintiff had excellent shoulder range of motion with no AC or C joint tenderness, full function at her elbow, wrist, and fingers, and markedly positive impingement sign for rotator cuff problems. Tinel's, Durken's, and Phalen's tests were positive for carpal tunnel and thenar atrophy. Dr. Dass recommended injections for her shoulder inflammation and Vitamin B6 or a wrist splint for her carpal tunnel. He opined that a carpal tunnel operation could help alleviate her symptoms.

Plaintiff returned to Dr. Pasupuleti on September 1, 2000 (R. 97-99). She complained that her symptoms were getting worse and she could not use her hands (R. 97). Upon examination, Plaintiff had positive Phalen's and Tinel's signs at both wrists, left worse than right (R. 98). There was a slight flattening of her thenar muscle group and weakness (4 out of 5) in both hands. Dr. Pasupuleti diagnosed her with carpal tunnel syndrome, quite severe in both hands, no evidence of cervical radiculopathy, plexopathy, myelopathy, or any other mononeuropathy, and recommended a rule out of superimposed bursitis or rotator cuff in the right shoulder. An abnormal EMG showed no response of bilateral median sensories and normal

ulnar and radial sensory action potentials. A median motor study showed very prolonged distal latencies with proximal latencies less than the distal, suggesting the severity of the degree of the median nerve motor function. A needle examination was grossly abnormal in the thenar muscle group showing 2+ positive sharp waves and fibrillations. The EMG results revealed electroneurodiagnostic evidence of bilateral upper extremity median nerve compromise of the wrist compatible with carpal tunnel syndrome, bilateral, sensory and motor fibers, demyelinating, axonal, quite severe in degree, no superimposed cervical radiculopathy, and no evidence of mononeuropathy in the right upper extremity suprascapular or subscapular nerve distribution (R. 99). Dr. Pasupuleti informed Plaintiff that with the progressive nature of her carpal tunnel syndrome, conservative therapy may not be beneficial and she may lose her muscle bulk in the thenar muscle groups over a period of time without surgical intervention.

In a job description form completed September 3, 2000, and Plaintiff described her job as walking 1-8 hours a day, standing 1-8 hours a day, and a variable amount of time sitting (R. 102).

At the request of the General Motors National Benefits Center, Dr. J. L. Tofaute, M.D., examined Plaintiff on November 8, 2000 (R. 104-107). Plaintiff reported to Dr. Tofaute that she had left her job in August of 2000 because, on August 19, 2000, she had been put on a different job that required her to pack large boxes (R. 104). Plaintiff indicated that she has been in generally good health except for high blood pressure related to her weight (R. 105). She reported "excruciating pain" in her left shoulder and numbness and burning in her hands, and told the doctor she planned to postpone carpal tunnel surgery until after her litigation finished. Upon examination, Plaintiff was 5'3" and 350+ pounds (R. 106). Her left thenar eminence exhibited mild to moderate atrophy, both hands were slightly swollen, and she had positive

Phalen's flexion test bilaterally, reduced active range of motion of the left shoulder with positive AC joint compression stress test and flinching tenderness with palpation of the left AC joint (R. 106-107). Dr. Tofaute concluded Plaintiff was not physically capable of returning to work for the next two to three months and suggested a re-evaluation at that time (R. 107).

At the request of the National Benefit Center, Plaintiff saw Nathan L. Gross, M.D., on March 15, 2001 (R. 125-129). Plaintiff estimated that she was 5'6" and weighed 320 pounds (R. 127). An EMG showed denervation potential in the abductor pollicis brevis bilaterally (R. 128). Clinical examination did not reveal any abnormalities in her shoulders, and Dr. Gross found that her shoulder symptoms had improved significantly. Plaintiff did have electrophysiologic evidence of marked bilateral median mononeuropathy at both wrists. In a letter to the National Benefit Center, Dr. Gross reported Plaintiff's x-rays did not show bony abnormalities and her physical exam was normal. He concluded that Plaintiff did not have significant pathology to her shoulders and past symptoms may have reflected low grade impingement.

At the request of General Motors National Benefit Center, Plaintiff saw Richard Singer, M.D., on March 9, 2001 (R. 136-138). Plaintiff was 5'6" and 320 pounds (R. 137). X-rays revealed typical changes for a 49 year old person. Dr. Singer diagnosed her with tenosynovitis in multiple areas, medial epicondylitis, severe carpal tunnel syndrome bilaterally, and morbid obesity (R. 137-138). In a letter to General Motors National Benefit Center, Dr. Singer reported that Plaintiff's lab work included a high sedimentation rate and rheumatoid factor (R. 135). Additionally, her bone scan pointed to a systemic process and her EMG and nerve conduction studies revealed severe bilateral median nerve entrapment at the wrists. Based on these results, Dr. Singer stated that Plaintiff needed bilateral carpal tunnel release and that she should do no repetitive forceful gripping, twisting of the wrist, and should not use vibratory tools.

Seit Saeed, M.D., completed an attending physician's statement of disability on December 4, 2001 (R. 149). Dr. Saeed reported that Plaintiff first visited him on May 29, 2001, and visited him twice since then. Plaintiff was ambulatory and suffered pain, numbness, and weakness in her hands. Dr. Saeed reported that Plaintiff was totally disabled and would never be able to resume any work. Limited and conclusory medical records provided by Dr. Saeed through February of 2003 document treatment for sciatica, obesity, asthma, and kidney stones (R. 149-153).

II.    Analysis

    A.    Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d); see also S.S.R. 96-2p. The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion on "the issue[s] of the nature and severity of [the claimant's] impairment[s]." 20 C.F.R. § 404.1527(d)(2). Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer to treating source opinions on certain subjects that are "reserved to the Secretary," which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity, or a general and conclusory statement of disability or inability to work. See S.S.R. 96-5p. Also, an ALJ must give specific reasons when finding a Plaintiff's testimony not credible. S.S.R. 96-7p.

If the Commissioner seeks to rely on VE testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[1] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

B.   Factual Analysis

Plaintiff raises a number of interrelated arguments in challenging the Commissioners

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

determination that she is capable of performing light work. Plaintiff begins by incorrectly asserting that "There is no evidence in the record that Theresa could have performed any form of sedentary work since the alleged onset date of disability in August 2000. The vocational expert did not identify any sedentary jobs Theresa could perform nor did the ALJ." [Pl.'s Br. 11]. Yet, the VE specifically testified that, if Plaintiff were limited to sedentary work and had the restriction of no lifting or carrying over 10 pounds and required the use of a cane, she could perform nearly 5,000 jobs of surveillance system monitor, referral and information clerk, and switchboard operator (R. 187). The VE further testified that if Plaintiff lacked tactile sense in her palms and fingers and was unable to perform work that required fine touch, she would still be able to perform 2,700 sedentary jobs as a referral and information clerk (R. 188).

Plaintiff goes on to assert that the ALJ failed to conduct an analysis for his finding that she can perform light work [Pl.'s Br. 12]. Plaintiff's main claim is that the ALJ did not consider evidence that Plaintiff could not stand, sit, or walk for 6 hours in an 8 hour day and therefore could not do light work. The ALJ found Plaintiff's allegations regarding her limitations not totally credible.

     1. Credibility Determination

S.S.R. 96-7p sets the Commissioner's standards for credibility findings:

> The adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and

> to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

Here ALJ Jones in his findings states:

> The claimant's allegations that she is housebound and can perform no sustained work activities because of constant pain, weakness, numbness and loss of touch in both hands, an inability to stand or walk effectively, asthma attacks that are most likely to occur in very hot or very cold weather, and the need to lie down frequently to stop swelling in her legs were not fully credible. They are inconsistent with the objective medical evidence, the lack of more aggressive medical treatment, the claimant's ordinary activities, and the claimant's demeanor at the hearing where she provided vague responses and appeared to exaggerate her physical limitations and the lifting requirements of her past job.
>
> (R. 18-19)

Pertaining specifically to Plaintiff's allegations of her limitations in standing, sitting, and walking, ALJ Jones found:

> Dr. Tofaute observed no apparent difficulty with movement or walking when he examined the claimant in November 2000, and no physician has treated the claimant's lower extremities or imposed lower extremity work restrictions. Dr. Pasupuleti stated in September 2000, that, other than her hand, arm and shoulder problems, the claimant had "no other symptomatology". Despite a history of obesity, the claimant has not participated in a formal weight loss program.

The ALJ reasonably relied on the medical records in evaluating Plaintiff's credibility. At the hearing he questioned Plaintiff's unwillingness to have carpal tunnel surgery (R. 183). In light of the unanimous recommendations of Drs. Dass, Pasupuleti, and Singer that she have this surgery, it is unclear whether the ALJ was questioning her credibility or her medical judgment. Dr. Tofaute's report suggested her choice not to have the operation was to improve her legal position (R. 105). The ALJ's explanation of his credibility determinations regarding Plaintiff meets the standards established by the Commissioner. He articulated the evidence and specific reasons that lead him to his credibility assessment, and he relied on the entire case record in his

12

evaluation. When the ALJ's credibility finding is adequately explained, it is entitled to deference.[2]

2.      Residual Functional Capacity

Plaintiff asserts that the ALJ's determination that Plaintiff could perform light work is not based on substantial evidence. Plaintiff cites Dr. Saeed's opinion that Plaintiff could not work in

any occupation and recorded her obesity as one reason. Additionally, Plaintiff cited that she testified at the hearing that she had difficulty walking to her car and that she could not walk more than 20 feet.

Dr. Saeed began treating Plaintiff May 29, 2001, and had only three appointments with the Plaintiff before Plaintiff's hearing with ALJ Jones. He therefore was not a longstanding treating physician. According to 20 C.F.R. § 404.1527(d)(2)(i), the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight is given to the source's medical opinion. Additionally, according to C.F.R. § 404.1427(d)(4), the more consistent an opinion is with the record as a whole, the more with will be given to the opinion. ALJ Jones, in his opinion, stated that Dr. Saeed's opinion:

> [Was] not . . . consistent with any of the medical evidence contained in the record, including Dr. Saeed's own treatment records. The records provided by Dr. Singer, Dr. Gross and other medical sources have all contemplated work activity with certain limits on lifting and the use of the hands and arms. These records also demonstrate the claimant's condition has remained stable overall for the past two years. Moreover, Social Security Ruling 96-5p and 20 CFR § 202.1527(e) provide that the ultimate determination of "disability" under the Social Security Act is reserved to the Social Security Commissioner and her delegees, and opinions by other persons on such issues are not entitled to controlling weight.

---

[2] *See, Williamson v. Secretary of HHS*, 796 F.2d 146, 150 (6th Cir. 1986); *Beavers v. Secretary*, 577 F.2d 383, 386 (6th Cir. 1978).

13

(R. 19).

Plaintiff has worked for many years with her excessive weight. Her shoulder problems were significantly improved when she saw Dr. Gross in March of 2001 (R. 128). Plaintiff's carpal tunnel problems were apparently not sufficiently severe that Plaintiff felt she should accept the advice that she have a bilateral release. This impairment alone is not generally totally disabling. ALJ Jones factored in several limitations related to Plaintiff's wrist problem into his hypothetical questions. The vocational testimony indicated a significant number of jobs that could be done with such limitations.

Given the lack of support for Dr. Saeed's contentions, and the short amount of time of the treatment relationship, and significant contrary evidence, the ALJ was not bound to accept Dr. Saed's opinion when determining Plaintiff's RFC. The ALJ reasonably concluded that Dr. Saeed's extreme restrictions were inconsistent with the overwhelming weight of the objective record, and determined Plaintiff's RFC with that in mind.

Based on the record as a whole, there is substantial evidence to uphold the Commissioner's findings.

III.    Recommendation

For the reasons stated above, it is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S.

140 (1985); Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir. 1991); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Willis v. Sec'y of Health and Human Servs., 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

    Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: April 18, 2005                                             s/Steven D. Pepe
Ann Arbor, Michigan                                               United States Magistrate Judge




Certificate of Service

    I hereby certify that on April 18, 2005, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet Parker, and I further certify that I mailed a copy to the following non-ECF participant: Robert MacDonald.

                                                    s/William J. Barkholz
                                                    Courtroom Deputy Clerk